IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs October 29, 2002

## STATE OF TENNESSEE v. TIM WILLIAM STRICKLAND

**Direct Appeal from the Circuit Court for Sevier County**
**No. 8538      Rex Henry Ogle, Judge**

---

**No. E2002-00775-CCA-R3-CD**
**May 29, 2003**

---

The Defendant was indicted for one count of rape of a child and for two counts of child abuse and neglect. A jury convicted the Defendant of all three counts. Following a sentencing hearing, the trial court sentenced the Defendant to twenty-five years for rape of a child and to four years for each count of child abuse. The trial court ordered that the sentences run concurrently for an effective sentence of twenty-five years. The Defendant now appeals, arguing the following: (1) that insufficient evidence was presented to convict him of the charged offenses, (2) that the trial court erred by admitting a note found at the scene and attributing it to the Defendant, and (3) that the trial court erred in sentencing the Defendant. Finding no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOE G. RILEY, J., joined.

Micaela Burnham, Assistant Public Defender, Sevierville, Tennessee, for the appellant, Tim William Strickland.

Paul G. Summers, Attorney General and Reporter; Helena Walton Yarbrough, Assistant Attorney General; Al C. Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

I. FACTUAL BACKGROUND

A. Trial

The following evidence was presented at the Defendant's trial: Monica Lynn Harper, the victims' mother, testified that she formerly dated the Defendant and that at the time of the offenses, the Defendant was living with her and her two children in a trailer. She stated that her daughter,

B.P.,[1] was four years old, and her son, J.P., was two years old. Harper testified that prior to the offenses in this case, she and the Defendant had planned to get married.

Harper testified that she was a cashier at Kroger's in Sevierville and that when she would go to work, the Defendant would watch her children because he was not working at the time. She recalled that on February 2, 2001, she was scheduled to work from 2:30 p.m. until 11:00 p.m., and the Defendant was supposed to watch the children while she was gone. She stated that when she left her home around 2:15 p.m., her children were playing. Harper maintained that neither of her children had any bruises or contusions on their faces when she left for work.

Harper testified that around 7:30 p.m., she called the Defendant to tell him about a job opportunity, but the Defendant did not answer the phone so she left a message on the answering machine. She reported that the Defendant returned her call around 7:45 p.m., and she told him that a painter had called. Harper stated that she gave the Defendant the painter's phone number. According to Harper, the Defendant said that he saw B.P. and J.P. kissing and that he had slapped B.P. which left a mark on her nose. She testified that she told the Defendant, "well, they're two and four. They're brother and sister, and they're going to do that." She stated that she then told the Defendant that they "would deal with it when [she] got home." Harper testified that the Defendant responded that he already had his clothes packed and that he was going to Alabama because "he didn't want [her] to be mad at him, and he didn't want to argue about it." She stated that she told him again that they would deal with it when she got home, and they hung up.

Harper stated that she began to get worried after she thought more about her conversation with the Defendant. She maintained that she did not allow the Defendant to slap her children in the face and that she had never known him to do so in the past. Harper testified that she tried to call the Defendant back, but he did not answer. She stated that she then tried to call her neighbor, Officer Charles Evans, to ask him to check on her children. Harper reported that Officer Evans did not answer the phone, so she left a message on his machine. She testified that she then called the police department and asked "dispatch" to relay a message to Evans.

Harper testified that she called the police department, and then she left work around 9:15 p.m. to go home and check on her children. She recalled that when she got home, the Defendant's car was gone, the door was unlocked, and the television was on. Harper testified that "[t]here was stuff all over the floor," spaghetti on the stove, and dishes piled up in the sink and on the table. She stated that her children shared a bedroom and that she found them in their room on their beds.

According to Harper, B.P. "had bruises all over her face, and her eyes were black, and her nose was red and white, and she had dry blood in her nose, and her lips were swollen and busted, and she had just bruises everywhere." She stated that J.P. had bruises on the side of his face, on his

---

[1] It is the policy of this Court not to identify minor children involved in sexual abuse cases by name. Instead, we will identify the minor victims in this case by their initials.

cheeks, and on his throat. Harper testified that Officer Evans arrived at her house immediately after she did and that he called Detective Chris Pearson.

Harper reported that she took off B.P.'s shirt and found bruises on her chest, back, and arms. She stated that when she pulled B.P.'s pants down to check for bruises, she noticed that there was blood in B.P.'s panties. Harper testified that she got upset, and Officer Evans took her to the bathroom so that the children would not see her that way. She stated that an ambulance took her and the children to Fort Sanders Hospital.

Harper recalled that the hospital took pictures of J.P., and used a rape kit, x-rays, and an ultrasound to determine the extent of B.P.'s injuries. She stated that B.P. "was scared, and she was shaking, and she was crying" and she complained that "her belly hurt." Harper testified that the hospital "found fluid around [B.P.'s] pelvic area." Both children were then transported by ambulance to Children's Hospital. Harper identified four photographs showing injuries to her children's faces. She also identified a picture of her bedspread that had blood on it. Harper testified that the bedspread did not have blood on it when she went to work.

Harper testified that she found a note on a table in her living room. She stated that the note was written on her daughter's writing tablet and that the handwriting belonged to the Defendant. According to Harper, the note read as follows: "Monica, I am sorry. I never wanted to be the one to blame. I caught the kids kissing. I can't deal with it anymore. I love you. Love, Tim. Bye." The note was introduced into evidence.

Harper testified that B.P. told her, "My daddy put his pee pee in my pee pee." She noted that B.P. referred to the Defendant as "daddy." Harper stated that the Defendant had planned to adopt the children when they got married. She explained that she and her children "called all the private area pee pee. On a man it is a penis, on a woman it's the vagina."

On cross-examination, Harper testified that she had been living with the Defendant since August 2000. She stated that she had left her children with the Defendant in the past. Harper acknowledged that after the Defendant initially told her that he had slapped B.P., she did not leave work immediately. She stated that the children had bruises on their shins from playing.

Harper testified that B.P. would get yeast infections, and she would say that "her pee pee was burning." She stated that she took B.P. to a doctor for the yeast infections, and he told her not to give B.P. bubble baths and gave her a cream to be applied to the outside of B.P.'s vagina. On re-direct examination, Harper testified that B.P. last had a yeast infection a couple of years before the incident in this case. She stated that the last yeast infection was before she even met the Defendant.

Chris Pearson testified that in February 2001, he was an investigator with the Sevierville Police Department. He stated that on February 2, 2001, he responded to Harper's home. When he arrived, Officer Charles Evans, Harper, and the two children were present. Pearson reported that he observed bruises on B.P.'s head and face. He testified that both children had bruises on their bodies

and that he took photographs of the injuries. Pearson testified that after seeing the bruises on B.P.'s face and chest, he asked Harper to pull B.P.'s pants down so that he could see if she had any injuries in that area. He stated that he immediately noticed that B.P.'s panties "were blood soaked completely." Pearson testified that there was also a blood stain on the bedspread in the room in which Harper and the Defendant slept.

Pearson testified that after he realized the extent of B.P.'s injuries, he advised Officer Evans and Harper that they needed to call an ambulance. He recalled that both children were transported to Fort Sanders Hospital and later to Children's Hospital. Pearson testified that the Defendant was not in the home when he arrived. He stated that the Defendant was later arrested in Alabama.

On cross-examination, Pearson acknowledged that the blood stain on the bedspread was in the Defendant's room, and the children were found in their own room. He stated that the blood on the bedspread was sent to the Tennessee Bureau of Investigation (TBI) for analysis.

Mary Palmer Campbell, M.D., testified that she is a pediatrician and that she works in the areas of inpatient medicine, emergency medicine, and pediatric forensics at East Tennessee Children's Hospital in Knoxville. She stated that she examined both B.P. and J.P. on February 3, 2000. According to Dr. Campbell, B.P. had multiple bruises on her forehead, two linear bruises on her left cheek that went across the bridge of her nose, a really deep bruise on the left upper eyelid, a linear scrape mark or abrasion on the back of her neck, and dry blood in both openings of her nose. Dr. Campbell explained that linear bruises can be caused by being hit with an open hand "because the pressure that the fingers cause pushes the blood up between your fingers." She further testified that B.P. had bruises on her right shoulder, a bruise across her left back, a bruise along the left of her spine which measured about one and a half inches by one centimeter, a single bruise to the lower spine, and scratch lines across the back of her neck and her mid-upper back.

Dr. Campbell testified that J.P. had a bruise across his forehead, bruises across both cheeks (the one on the left cheek looked like a semi-circle), a bruise on his upper lip, a bruise on his scalp through the parietal region, a bruise behind the right ear, a "really deep purple" bruise that "involved his whole upper left ear," a semi-circular or circular bruise to the side of the neck, tiny bruises across his chest, a bruise to the left of his chest bone which measured about a half an inch in diameter, other smaller scattered bruises on his chest, a small bruise across his upper left arm, multiple contusions extending across the right shoulder all the way down both sides of the back to below the scapulae, and tiny abrasions that involved his entire upper back. She testified that the bruises that she found on both children were not consistent with those one would expect to find with child's play or accidental falling. Instead, she noted, the injuries were consistent with trauma inflicted by a person.

Dr. Campbell also examined B.P.'s genitalia, and she noted the following:
[B.P.] had a small bruise around the area of the pee hole on the right hand side, and she had a very tiny tear of the very back of the privates, what we call the posterior fourchette. Then in the opening of the hymen at the very back she had a very large

-4-

tear that went through the tissues below the hymen to somewhere near the region where your privates open out to the outside skin.

Campbell identified five photographic slides of B.P.'s genitalia, and she used the slides in court to further explain the injuries. She testified that the injuries that B.P. sustained were consistent with a penis being thrust into her vagina. She maintained that the injuries were not consistent with someone rubbing lotion on the vagina.

On cross-examination, Campbell acknowledged that she was not able to say what caused the injury to B.P.'s vagina. She stated that it was an object inserted with force. Campbell testified that some object was inserted into B.P.'s vagina "with sufficient force to make a tear that [she had] not seen in any of the number of children that [she had] examined in the past." She elaborated that it was "one of the most significant injuries [that she had] seen."

The Defendant testified at trial and described the events of February 2, 2000 as follows:

We went over to . . . I can't remember the name of the lake . . ., but we went down behind the dam and there's a playground and stuff, and the kids played. Me and Monica, we were a ways from the kids, but the kids were down at the playground playing, and I don't know, the wind and stuff was blowing too hard so we said we was going to go back to the house, so we loaded everything up and went back to the house.

All of us got a nap before Monica went into work, and Monica left around two something to go to work, I guess, or right before 2:00. After Monica went to work there was some alcohol in the refrigerator, so I started drinking, and I guess my drinking got out of hand.

Monica had liquor in the house, so I started drinking the liquor, and before I knew what happened I was in a partial blackout.

. . . .

The day rolled along, and [B.P.] asked me if she could go out and play with the neighbor's kids and I told her yes, but I didn't let [J.P.] go because . . . the kids were a lot bigger than he is and stuff, and they liked to get out in the road. They had this little car they pushed around all the time, and [J.P.] would get out there in the road, and I didn't want him out in the road.

So [B.P.] went outside and played with the neighbor's kids, and [J.P.] was back in his room, and I'd go back and I'd check on him every once in a while, but I was sitting [in] the living room and all of the sudden I heard [J.P.], he started crying. So I went back to where [J.P.] was at and he had did a split on the bed.

. . . .

Yes, he had fallen on the bed.

. . . .

Well, I went back until he stopped crying and then I just tended to him, and then I went back in the living room. I went back to check on him, and when I went back he had used the bathroom in the floor and . . . you know, he's potty trained, and he knows better than to use the bathroom in the floor. But I had been drinking and

everything . . . you know . . . well, anyway, . . . I took him in the bathroom and got him cleaned up and stuff, and then I popped him a couple times on the butt for using the bathroom in the floor.

I took the stuff that he had on, and took a towel and cleaned the floor up and stuff, and I went back in the living room. I was just sitting there watching T.V., and then [B.P.] came in from outside playing, and she was dirty and stuff from where she'd been outside playing. I made her take her shoes off and stuff, and she went back in the back bedroom where [J.P.] was at.

. . . .

And she went back in the back bedroom and was playing with [J.P.]. Then they just got real quiet for a long time, and you know, kids, it ain't the loudness you worry about, it's when they get quiet, and they done got into something. Well, especially these two.

Well, anyway, I went back in the back bedroom and [B.P.] was on top of [J.P.] kissing him.

. . . .

He was laying on the bed, and she was on top of him and she was kissing him.

. . . .

No, that wasn't the first time we've caught them. And I went over . . . I just went over to whip them and [B.P.] swung around and I hit her across the face and . . . you know, with the effects of the alcohol and stuff, I guess I lost my temper. I didn't do it intentionally.

. . . .

I had been suffering from depression and everything else.

. . . .

I went into the bathroom into our room . . . this is on the opposite side of the house from where [B.P.] and [J.P.'s] room was at, and I used the bathroom and I was standing in the bathroom smoking a cigarette, and [B.P.] came in and told me her pee pee hurt. You know, I was still mad and stuff because it hadn't been too long since I caught them in there doing what they was doing.

I put [B.P.] up on the bed and I was putting cream on her, and I can't say that I did do it, but I can't say that I didn't do it, but I might have accidentally hurt her, but it wasn't a sexual act, and I didn't do it intentionally. I didn't mean to hurt that baby.

The Defendant testified that he applied cream to B.P.'s vagina with his hand. He stated that after applying the cream, he went into the living room and began "thinking about all the stuff that [he] and Monica had been through, and [they] kept catching the kids doing what they was doing, and they was always misbehaving and stuff . . . they're hellions." The Defendant reported that everything became "sort of blurry." He stated that he remembered calling Harper to tell her that he had lost his temper with the children and that he was "tired of everything that was going on, and . . . if it kept going on I was going to end up in jail or something." The Defendant testified that he could not remember everything that he said to Harper, but he recalled that he told her that he was leaving to

go to Georgia. He stated that he told her that his bags were packed and that he was leaving. The Defendant testified that he waited a few minutes for Harper to come home, and when she did not arrive, he left.

The Defendant testified that B.P. had a bruise on her nose where he slapped her. However, he maintained that there were other injuries on B.P. from when they had been camping and "the kids had been chasing a basketball around in the woods for a day." He stated that the children got their injuries from "running and falling and playing." The Defendant testified that he did not commit any sexual act against B.P. and that he did not insert his penis into her vagina. When asked how B.P. might have been injured, he stated that because he had been drinking it was "just blurry." The Defendant testified that he did not remember writing a note and that the note introduced into evidence did not look like his handwriting.

On cross-examination, the Defendant testified that he is six feet tall and that on the day of the offense, he weighed 145 pounds. He acknowledged that at the time of the offenses in this case, B.P. was approximately two feet tall and about 50 or 60 pounds and that J.P. was approximately a foot and a half to two feet tall. The prosecutor asked the Defendant, "And you took it on yourself to knock them around a little bit that day, is that what you're telling the jury?" The Defendant responded, "Yes, I did." The prosecutor then asked the Defendant where he hit the children, to which he responded, "A little bit of everywhere, I guess." He admitted that he slapped the children in the face. He stated that he did not deny that he caused the injuries shown in the pictures of the children.

The Defendant testified that a "partial blackout is when moments of time are missing." He acknowledged that he was able to call his girlfriend and drive to Alabama in his drunken state. The Defendant reluctantly testified that he thought someone had framed him for the offenses in this case because he did not remember writing a note and did not think the note was in his handwriting. He admitted that he told Officer Pearson that he did not have anything to drink on the night of the offense, but he maintained that he did so because he was in denial about his "problem." The Defendant testified that he did not see any blood on B.P. after applying the cream. The Defendant viewed a photograph of a blood stain on a bedspread and stated that he did not believe that it was on the bed that he and Harper shared. He acknowledged that he was "rough" with B.P. On re-direct examination, the Defendant stated, "Monica was just as abusive to the kids as I was."

Claude Strickland, the Defendant's father, testified that the Defendant has had an "alcohol problem" since he was a teenager. He stated that the Defendant would sometimes have "blackouts." He stated that the last time he saw the children prior to the offense, J.P. had bruises on both sides of his face from "play[ing] rough." Strickland testified that the Defendant "took care of the kids." On cross-examination, he stated he did not know of any injuries to B.P.'s vagina.

B. Sentencing Hearing

The only witness to testify at the Defendant's sentencing hearing was his father, Claude Strickland. He stated that the Defendant "is a good person but he does have a problem with his alcohol." Strickland testified that the Defendant has had an alcohol problem since he was a teenager. He noted that the Defendant did not have a record for violent or sexual offenses. He testified that the Defendant had been arrested for "DUIs and stuff like that." Strickland testified that the Defendant is a painter and that he is a "very hard worker." He stated that Harper never made any complaints to him about the Defendant hurting the children.

## II. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant argues that insufficient evidence was presented at trial to convict him of the charged offenses. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

We conclude that sufficient evidence was presented for a rational jury to find the Defendant guilty of child abuse. Child abuse and neglect is defined as follows:

> Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused or neglected child is six years of age or less, the penalty is a Class D felony.

Tenn. Code Ann. § 39-15-401(a). In this case, the victims' mother testified that when she left for work on February 2, 2001, she left her children, B.P. and J.P., in the Defendant's care. She stated

that the children did not have any bruises on their faces. The Defendant admitted that he was home alone with the children and hit each of the children "[a] little bit of everywhere." He also stated that he was in a "partial blackout" and that he could not remember all of the events of the evening. The Defendant acknowledged he left the children alone in order to drive to Georgia. Finally, Dr. Campbell examined both of the children and listed in detail the injuries to each. She stated that the injuries sustained by B.P. and J.P. were consistent with trauma inflicted by a person and not from normal child's play.

In addition, the Defendant argues that insufficient evidence was presented "that any penetration of [B.P.'s] vagina occurred as the result of a sexual act." We disagree. "Rape of a child is the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if such victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Id. § 39-13-501(7).

We conclude that sufficient evidence was presented for a rational jury to find the Defendant guilty of rape of a child. The victim's mother testified that B.P. did not have any injuries to her vagina when she left for work and that the children were in the Defendant's care while she was at work. The Defendant stated that he may have accidentally injured B.P. while applying yeast infection cream to her vagina. He also acknowledged that he was in a partial blackout due to drinking alcohol.

Both B.P.'s mother and Officer Pearson testified that immediately after they arrived at the home, they inspected B.P. and found that her panties were soaked with blood. They also testified that there was a blood stain on the bed shared by B.P.'s mother and the Defendant. B.P.'s mother stated that the stain was not on the bed when she left for work. In addition, Dr. Campbell testified that B.P. suffered multiple injuries to her vagina which were caused by something penetrating her vagina with force. She stated that such injuries were consistent with a penis being thrust into her vagina. Finally, B.P. stated at the hospital, "My Daddy put his pee pee in my pee pee."

B. Introduction of Letter

The Defendant argues that the trial court erred by allowing the State to introduce into evidence a letter allegedly found at the scene. According to the victims' mother, she found a note in the living room on the day of the offenses. She stated that the note read as follows: "Monica, I am sorry. I never wanted to be the one to blame. I caught the kids kissing. I can't deal with it anymore. I love you. Love, Tim. Bye." The note was introduced into evidence. Harper testified that the handwriting on the note was the Defendant's. The trial court stated that it allowed the note into evidence because "[b]ased on statements that [the Defendant] made to [Harper] that he had struck one of the children or both the children, it is corroborated by his statement."

As a general matter, we note that "the admissibility of evidence is generally within the broad discretion of the trial court . . . [and that] absent an abuse of that discretion, the trial court's decision will not be reversed." State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence and resolve any conflicts in the evidence. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). We, therefore, must review this matter under an abuse of discretion standard.

The Tennessee Rules of Evidence state that all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. However, "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

We conclude that the trial court properly admitted the note into evidence. The information in the note was relevant because it corroborated the testimony of Harper. In addition, the relevance was not substantially outweighed by prejudice to the Defendant. This issue is without merit.

## C. Sentencing

The Defendant argues that the trial court erred in sentencing him. When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). The presumptive sentence for a Class A felony is the midpoint

of the sentencing range unless there are enhancement or mitigating factors present. Id. If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

In this case, the Defendant was convicted of rape of a child, a Class A felony, and child abuse, a Class D felony. As such, he was subject to a fifteen-to-twenty-five-year sentence for the rape of a child conviction, and to two to four years for each child abuse conviction. In sentencing the Defendant, the trial court applied the following enhancement factors: (1) that "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1); and (2) that "[t]he defendant abused a position of . . . private trust. . . ," id. § 40-35-114(15). The trial court did not apply any mitigating factors.

The Defendant argues that the trial court erred by enhancing his sentence because he had a previous history of criminal convictions or criminal behavior. The record indicated that the Defendant had several prior alcohol-related convictions. The Defendant states that although he has prior convictions, "they are for DUI, and there is no history of violent or sexually aberrant behavior whatsoever." However, we note that the statute does not require that the additional crimes be similar in nature to the current offense. This issue is without merit.

The Defendant also argues that the trial court erred by enhancing his sentence because he violated a position of private trust. He concedes that he was in a position of authority over the

victims, but he contends that "it is almost exclusively authority figures that are charged with Child Abuse of a Child under the Age of Six Years, and it is usually an authority figure that is charged with Rape of a Child." We find this argument unpersuasive. Enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114.

> The obvious purpose of these limitations is to exclude enhancement factors which are not relevant to the offense and those based on facts which are used to prove the offense. Facts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment. The legislature, in determining the ranges of punishment within the classifications of offenses, necessarily took into account the culpability inherent in each offense.

State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994). However, the violation of a private trust is not an essential element of child abuse.

Finally, in sentencing the Defendant, the trial court also considered the circumstances of the offense:

> The Court also finds that from the totality of the circumstances of the rape of this little girl, that he beat her, a little four-year-old girl, in addition to doing the act that he did to her and then after he did what he did, he left them. He left these children at that home by themselves as he left. I remember his testimony very clearly. He was talking about black-outs and his memory got awfully selective when he was testifying about what he could remember and what he could not remember.
>
> After he left and left the children alone, he drove either to Alabama or Georgia one, I cannot now remember which one it was, but [he] was able to navigate that long distance without any substantial difficulty.

We conclude that the trial court properly sentenced the Defendant in this case.

Accordingly, the judgments of the trial court are AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE